IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MORRISON ENTERPRISES, LLC, and<br>CITY OF HASTINGS, Nebraska,<br><br>              Plaintiffs,<br><br>    v.<br><br>DRAVO CORPORATION,<br><br>              Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 4:08CV3142 |

MEMORANDUM AND ORDER ON DRAVO CORPORATION'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ON THE CITY OF HASTINGS' CLAIMS RELATED TO ITS
WATER SUPPLY SYSTEM

      Now before me is "Dravo Corporation's Motion for Partial Summary Judgment on the City of Hastings' Claims Related to Its Water Supply System," filing 110. For the following reasons, Dravo's motion will be granted.

### I.    BACKGROUND

      From approximately1965 to 1982, Dravo Corporation (Dravo) owned and operated an industrial facility located at 108 South Colorado Avenue in the City of Hastings, Nebraska (Hastings). (See Dravo's Br., filing 232, Statement of Material Facts (Facts) ¶¶ 1-2, 9-10, 12; Hastings' Supp. Response Br., filing 261, Facts ¶¶ 1-2, 9-10, 12.) This facility, which is referred to as the "Colorado Avenue Subsite," is alleged to be a source of contamination to Hastings' water supply system. (See Dravo's Br., filing 232, Facts ¶ 1; Hastings' Supp. Response Br., filing 261, Facts ¶ 1.) The Colorado Avenue Subsite is located within a half-mile west of Hastings' municipal water production well M-18, and within a block of Hasting's municipal water production well M-10. (See Dravo's Br., filing 232, Facts ¶ 3; Hastings' Supp. Response Br., filing 261, Facts ¶3.)

      Beginning sometime before July 1968 and continuing into 1971, the industrial facility

1

used trichloroethylene (TCE) as a degreasing solvent.  (See Dravo's Br., filing 232, Facts ¶ 11; Hastings' Supp. Response Br., filing 261, Facts ¶11.)  From 1971 until 1982, the facility used 1,1,1,-trichloroethane (TCA) as a degreasing solvent.  (See id.)

In 1983, Hastings attempted to put well M-18 into service.[1]  (See Dravo's Br., filing 232, Facts ¶ 14; Hastings' Supp. Response Br., filing 261, Facts ¶ 14; see also Dravo's Index, filing 112, Ex. B, at 10002601.)  This effort was discontinued–and the well was permanently removed from service–due to complaints about the water's foul taste and odor.  (See Dravo's Br., filing 232, Facts ¶ 15; Dravo's Index, filing 112, Ex. B, at 10002601; Hastings' Supp. Response Br., filing 261, Facts ¶15.)[2]  Also in 1983, the Nebraska Department of Health began investigating contamination in the Hastings-area groundwater.  (Dravo's Index, filing 112, Ex. B, at 10002601; Am. Compl., filing 53, ¶ 19.)  During this investigation, chlorinated solvents, including TCE and TCA, were discovered in samples collected from well M-18.  (See Dravo's Br., filing 232, Facts ¶ 14; Hastings' Supp. Response Br., filing 261, Facts ¶ 14; see also Dravo's Index, filing 112, Ex. B, at 10002601.)  In 1986, the Environmental Protection Agency "identified the Colorado Avenue site as the source of high levels of TCE found in well M-18."  (Hastings' Supp. Response Br., filing 261, Facts ¶ 21.)

Since approximately 1984, Hastings "has participated in extensive, ongoing communications with [the Nebraska Department of Health, the Nebraska Department of Environmental Quality, and the Environmental Protection Agency] . . . regarding contamination of the City's drinking water supply, and has remained in contact with those agencies to determine what measures the City should take to provide alternative supplies of safe, uncontaminated water to its residents."  (Hastings' Supp. Response Br., filing 261, Facts ¶¶ 19 & 20; see also Hastings' Response Br., filing 185, Facts ¶ 10 (stating that Hastings has participated in these communications for the past 25 years).)  Hastings states that it has replaced at least seven water production wells due to contamination caused by volatile organic compounds (VOCs), and it has

---

[1]In 1983, the well had been out-of-use for approximately 30 years. (Dravo's Index, filing 112, Ex. B, at 10002601.)

[2]Evidence indicates that well M-10 has also been retired from service.  (See Index, filing 285, Ex. B, at CITY006070-006071; id., Ex. C, Jensen Dep. at 71:16-75:6.)

installed new water mains and related improvements to address the loss of water supply and pressure due to the closure of contaminated wells. (See Hastings' Response Br., filing 185, Facts ¶¶ 8, 11-13.)[3] Hastings' efforts to provide uncontaminated water to its residents continue, and none of the contaminated wells has returned to service. (Id. ¶ 14.) It is unclear precisely when Hastings began work to address the contamination, but Marvin Schultes, who presently serves as the Manager of Utilities for Hastings Utilities and who has worked with Hastings Utilities since 1977, states that "[t]he City began working as diligently and promptly as possible to act on the demands of the EPA and State to provide alternative supplies of safe, uncontaminated water to its residents and for public use," before proceeding to describe this work in some detail. (Hastings' Index, filing 186, Ex. H, Shultes Aff. ¶¶ 3-4, 10-12.) The record also includes evidence of "Alternative Water Supply Work Orders" dating to 1986. (See Dravo's Index, filing 118, Ex. P, Attach. C.)[4]

On September 27, 2001, the United States filed an action against Dravo and Desco Corporation (Desco) pursuant to section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9607(a). (Hastings' Index, filing 186, Ex. B ¶ 1.) In that case, which is titled United States v. Dravo Corp., No. 8:01cv500

---

[3]It should be noted that Hastings does not claim that the VOCs originating from the Colorado Avenue Subsite are the sole cause of all of the city's groundwater contamination and related well closures and water system improvements. (See, e.g., Am. Compl., filing 53, ¶¶ 22-26 (alleging that groundwater contaminants originated from seven subsites, including the Colorado Avenue Subsite); Hastings Response Br., filing 185, Facts ¶ 12 ("Each water system project was a component of an overall plan for the provision of alternative water supplies until the remediation of the massive plume of groundwater contamination caused or contributed to by Dravo . . . ." (emphasis added)).)

[4]Although Hastings disputes the authenticity of the work order referenced by Dravo in support of its claim that work began in 1986, (see Dravo's Br., filing 232, Facts ¶ 24; Hastings' Supp. Response Br., filing 261, at 3, 5-7 & Facts ¶ 24), Hastings' expert witness appears to have based his costs calculation upon the same work order, and he states specifically that various work orders have been performed "from 1986 to the present to replace the water supply needs previously provided by the contaminated wells," (see Dravo's Index, filing 118, Ex. P at pages 1, 10, & Attach. C). I note also that Hastings' evidence indicates that the city began remedial work "promptly" after it began communicating with the relevant state and federal agencies in approximately 1984.

(D. Neb. 2001), the United States sought "to recover response costs incurred by the United States as a result of releases or threatened releases of hazardous substances at or from the Colorado Avenue Subsite." (Id.) Dravo and Desco joined Hastings as a third-party defendant in the case in order to seek contribution and indemnification from Hastings. (See Hastings' Index, filing 186, Ex. I ¶ 12.) Hastings then filed a two-count counterclaim against Dravo and Desco alleging that Dravo and Desco were liable under CERCLA for releases or threatened releases of hazardous substances and seeking contribution from Dravo and Desco pursuant to CERCLA, "the federal law of contribution," or "the common law and statutes of Nebraska." (See generally Hastings' Index, filing 186, Ex. I.) In May 2006, a consent decree and a memorandum and order approving a settlement agreement between Dravo and Hastings were filed in United States v. Dravo. (See Hastings' Index, filing 186, Exs. J-L.)

On February 24, 2009, Morrison Enterprises, LLC (Morrison) and Hastings filed an eight-count amended complaint against Dravo. (See generally filing 53.) Counts I-III are brought by the plaintiffs jointly, and Counts IV-VIII are brought by Hastings alone. Count I alleges that the plaintiffs are entitled to a "recovery of response costs pursuant to 42 U.S.C. § 9607(a)." (See Am. Compl., filing 53, ¶¶ 46-67.) Count II alleges that the plaintiffs are entitled to "a declaratory judgment . . . for response costs incurred, and future response costs or damages to be incurred, as a result of the release or threatened release of hazardous substances." (Id. ¶ 69 (citing, inter alia, 42 U.S.C. § 9613(g)(2)).) Count III, titled "Non-Contractual Indemnity," alleges that the defendant should bear "the costs associated with the remediation of TCE contamination emanating from the Colorado Avenue Subsite." (Id. ¶ 80.) Count IV, titled "Negligence," alleges that the defendant breached its duty to Hastings "to operate and maintain its facility in such a manner as to prevent soil and groundwater contamination," which caused Hastings to suffer damages. (See id. ¶¶ 81-91.) Count V, titled "Private Nuisance," alleges that Hastings "has been unreasonably deprived of its use and enjoyment of . . . property housing certain water system infrastructure" due to the nuisance created by "the ongoing migration of hazardous substances from Dravo's Colorado Avenue facility." (See id. ¶¶ 96, 98.) Count VI, titled "Public Nuisance," alleges that "Dravo's action in contaminating the soil and groundwater in and around the City of Hastings is a public nuisance." (See id. ¶ 103 (citing Neb. Rev. Stat. § 81-

1506).)  Count VII, labeled "Trespass," alleges that contaminants from the Colorado Avenue Subsite that exist in the city's soil and groundwater interfere with Hastings' "exclusive right of possession in the property in or upon which the City's wells and water mains are located," and that Dravo's "failure to adequately respond to the contamination constitutes a knowing and willful maintenance of the trespass on the City's property."  (See id. ¶¶ 107, 109-110.)  Count VIII, titled "Breach of Contract," alleges that counterclaims filed by Dravo in response to the plaintiffs' original complaint breach "the covenant not to sue, the release, and the discharge provisions" of a January 24, 2006, Settlement Agreement and Release and a May 26, 2006, court order.  (See id. ¶¶ 113, 118, 119-120.)

On June 19, 2009, Dravo filed the instant motion for summary judgment.  (See filing 110.)  In the supplemental brief it submitted in support of this motion, Dravo states that the motion is directed against Hastings' claims based on "the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675 ("CERCLA"), negligence, public nuisance, private nuisance, and trespass," and adds that Hastings' and Morrison's "separate claims for damages related to the Well D System are outside the scope of the motion."  (Dravo's Br., filing 232, Facts ¶ 7.)[5]

## II.  STANDARD OF REVIEW

A motion for summary judgment shall be granted by the court "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A "material" fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party.  Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).  If the moving party meets the initial burden of

---

[5]According to the amended complaint, the Well-D system is an extraction well designed to manage contaminated groundwater in Hastings.  (See Am. Compl., filing 53, ¶¶ 33-34.)

establishing the nonexistence of a genuine issue, then the burden shifts to the nonmoving party to produce evidence of the existence of a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment," Anderson, 477 U.S. at 257, and "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial," id. at 256 (citing Fed. R. Civ. P. 56(e)).

### III. ANALYSIS

Dravo argues that it is entitled to a partial summary judgment because a number of Hastings' claims are untimely. I shall analyze each of Dravo's arguments in turn.

### A. CERCLA

Dravo argues that it is entitled to summary judgment on Hastings' CERCLA claim (Count I), insofar as the claim "requests damages for contamination of the water supply system," because Hastings did not initiate its action within the period specified in CERCLA's statute of limitations. (See Dravo's Br., filing 232, at 12; see also id. at 8-12.) I agree.

"CERCLA imposes strict liability for environmental contamination upon four broad classes of PRPs [(potentially responsible parties)]," and once an entity is identified as a PRP, it may be held liable for the costs specified in CERCLA section 107(a). Burlington Northern and Santa Fe Ry. Co. v. United States, 129 S. Ct. 1870, 1878 (2009); see also 42 U.S.C. § 9607(a). The statute of limitations for cost recovery actions brought under section 107(a) draws a distinction between "removal actions" and "remedial actions." See 42 U.S.C. § 9613(g)(2). Specifically, section 113(g)(2) of CERCLA states,

> An initial action for recovery of the costs referred to in section 9607 of this title must be commenced–
>
> (A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and
>
> (B) for a remedial action, within 6 years after initiation of physical on-site

> construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

42 U.S.C. § 9613(g)(2).

Dravo argues that the construction work performed by Hastings on its water supply system constitutes a remedial action, and therefore Hastings was required to file its cost recovery action within 6 years after initiating this construction work in approximately 1986.  (See Dravo's Supp. Br., filing 232, at 9-12.)

Whether Hastings' work constitutes a removal or a remedial action is a question of law. See, e.g., Reynolds Metal Co. v. Arkansas Power & Light Co., No. LR-C-95-281, 1997 WL 580361, at *5 (E.D. Ark. July 29, 1997) (citing cases).  I begin my analysis of this question with a review of the language of CERCLA itself.  The statute defines removal actions and remedial actions as follows:

> (23) The terms "remove" or "removal" means [sic] the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.  The term includes, in addition, without being limited to, . . . <u>provision of alternative water supplies</u> . . . .
>
> (24) The terms "remedy" or "remedial action" means [sic] those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.  The term includes, but is not limited to, . . . <u>provision of alternative water supplies</u> . . . .

42 U.S.C. §§ 9601 (23)-(24) (footnotes omitted) (emphasis added).  The parties seem to agree that Hastings' work amounts to the "provision of alternative water supplies."  (See, e.g., Hastings' Response Br., filing 185, at 14-15; Dravo's Reply Br., filing 210, at 10-11.)  Because the "provision of alternative water supplies" is cited as an example in both § 9601(23) and §

9601(24), however, the classification of Hastings' work as the "provision of alternative water supplies" does not resolve the question at hand.

Nevertheless, the statute does indicate that removal and remedial actions differ in a basic way. Specifically, § 9601(24) states that remedial actions are "consistent with permanent remedy," while § 9601(23) suggests that removal actions are relatively immediate responses to environmental threats. Courts' analyses of the differences between the two types of actions focus upon this distinction. For example, the Eighth Circuit has described removal actions as "those taken to counter imminent and substantial threats to public health and welfare," and remedial actions as "longer term, more permanent responses." Minnesota v. Kalman W. Abrams Metals, Inc., 155 F.3d 1019, 1024 (8th Cir. 1998). In County Line Inv. Co. v. Tinney, 933 F.2d 1508, 1512 n.6 (10th Cir. 1991), which was cited with approval in Union Pacific R.R. Co. v. Reilly Indus., Inc., 215 F.3d 830, 834 n.2 (8th Cir. 2000), the court explained,

> A "remedial action" under CERCLA includes investigation and cleanup actions "consistent with a permanent remedy" for a site. It is contrasted with a "removal action" under the statute, which is generally an emergency, interim response to particular site conditions that is governed by more limited and flexible NCP requirements.

The Supreme Court has also characterized a removal as a "short-term cleanup" and a remedial action as "measures to achieve a 'permanent remedy' to a particular hazardous waste problem." Exxon Corp. v. Hunt, 475 U.S. 355, 360 (1986) (citing 42 U.S.C. §§ 9601(23)-(24)).

I find that the work performed by Hastings on its water supply system constitutes a remedial action, but not a removal action. Hastings states that the work was performed "for the purpose of addressing the loss of water supply and pressure resulting from the closure of its contaminated wells." (Hastings' Response Br., filing 185, Facts ¶ 12.) Clearly, the work does not constitute a "cleanup or removal of released hazardous substances from the environment," 42 U.S.C. § 9601(23), but it is consistent with a permanent remedy for the contamination problem affecting groundwater in the vicinity of certain municipal wells. Moreover, it is undisputed that the work has been "continuing on an ongoing basis" for decades and is not yet completed, (Hastings' Response Br., filing 185, Facts ¶ 12), which is not typical of removal actions. In short, the work at issue is "consistent with a permanent remedy" for the lack of water that

resulted from the closing of contaminated wells, but it is not in the nature of an emergency cleanup or other interim response to an imminent threat to public health and welfare.

Hastings submits that, for several reasons, I should find that its "ongoing, continuous activities for the provision of alternative water supplies, including the installation of new water production wells and mains to provide safe, uncontaminated drinking and household water supplies to its residents . . . is a 'removal action'" within the meaning of the applicable statutes. (Hastings' Response Br., filing 185, at 15.) First, Hastings argues that the term "removal action" must be interpreted broadly to include "a series of activities over time at a single site." (Id. at 16.) In support of this argument, Hastings refers me to Geraghty & Miller, Inc., v. Conoco Inc., 234 F.3d 917, 926 (5th Cir. 2000), and Kelley v. E.I. DuPont de Nemours & Co., 17 F.3d 836, 843 (6th Cir. 1994).

In Geraghty & Miller, the court did state that "Congress intended that the term 'removal action' be given a broad interpretation." 234 F.3d at 926. The court added, however, that it had "often noted that removal actions generally are immediate or interim responses, and remedial actions generally are permanent responses." Id. The court then found that the response action in the case before it was "properly classified as removal," noting that G&M's monitor wells and piezometers were part of a "pilot corrective action program," or "detailed assessment" phase of a broader groundwater quality assessment program. The principles applied and the decision reached by the court in Greghaty & Miller are consistent with my finding that the "ongoing, continuous activities for the provision of alternative water supplies" undertaken by Hastings do not constitute a removal action.

In Kelley, the Sixth Circuit rejected the defendants' argument that a "site cleanup could involve multiple removal actions, and that each such action should have its own limitations period." 17 F.3d at 842. In doing so, the court found that it was "simply inconsistent" with CERCLA's "overriding objectives–cleaning up hazardous waste, and doing so at the expense of those who created it," "to require suit on each arguably independent removal activity." Id. at 843. The issue now before me is whether Hastings' water system projects constitute a removal action or a remedial action–not whether separate removal actions are combined for purposes of the statute of limitations. Kelley is inapposite.

Next, Hastings argues that "continuing or ongoing" removal actions may take several years to complete. (Hastings Response Br., filing 185, at 16.) I take Hastings' argument to be that its work can be classified as a removal action despite the fact that the work has spanned more than two decades. Some of the cases cited by Hastings in support of its argument do suggest that removal actions can span many years. (See id. at 16-18.) None persuades me, however, that Hastings' work on its water supply system should be deemed a removal action. Three of the cases cited by Hastings–specifically, Geraghty & Miller, Inc., v. Conoco Inc., 234 F.3d 917 (5th Cir. 2000); Cannon v. Gates, 538 F.3d 1328 (10th Cir. 2008); and Hanford Downwinders Coalition, Inc. v. Dowdle, 71 F.3d 1469 (9th Cir. 1995)–concern assessment and monitoring activities that are wholly incomparable to the decades of infrastructure improvements Hastings performed.[6] The remaining cases–California Dept. of Toxic Substances Control v. Alco Pacific, Inc., 308 F. Supp. 2d 1124 (C.D. Cal. 2004); United States v. Chrysler Corp., 157 F. Supp. 2d 849 (N.D. Ohio 2001); and General Elec. Co. v. Litton Indus. Automation Sys., Inc., 920 F.2d 1415 (8th Cir.1990), abrogated on other grounds, Key Tronic Corp. v. United States, 511 U.S. 809 (1994)–involve the actual physical removal of substances from contaminated land over time; thus, they too concern actions that are clearly distinguishable from Hastings' water system construction projects. In short, although the cases relied upon by Hastings do suggest that removal actions are not always limited in duration, they do not show that the sort of response action undertaken here might constitute an "ongoing" removal action.

Hastings argues next that its "ongoing, continuous activities for the provision of alternative water supplies" are "temporary response activities." (See Hastings' Supp. Response Br., filing 261, at 17-18.) I take it that Hastings means to suggest that its response action is not "consistent with a permanent remedy," 42 U.S.C. §§ 9601 (24), because the work is "temporary." Schultes' affidavit states that Hastings' efforts to provide alternative water supplies to its residents are planned to continue "at least until such time as the City is able to re-open the contaminated wells" or "at least until the groundwater contamination has been remediated."

---

[6]I note parenthetically that in Dowdle, the court clearly stated that it was attempting no analysis of the distinction between removal and remedial actions. See 71 F.3d at 1475-77 & n.10.

(Hastings' Index, filing 186, Ex. H., Schultes Aff., ¶¶ 12, 13 (emphasis added).) It does not follow from these statements, however, that the work described in his affidavit is not "consistent with a permanent remedy." On the contrary, Schultes' statements indicate that the work will continue indefinitely. The undisputed evidence demonstrates that the work has been ongoing for two decades, that no contaminated wells have yet been returned to service, and at least two of the wells have been "retired," and there is no indication of any plan to tear down the improvements Hastings has made to its water supply system once the contaminants are removed. In short, Schultes' statement that the work might cease at some undetermined future date does not indicate that the work is not in the nature of a permanent remedy, and no reasonable factfinder could conclude on this record that Hastings' years-long construction of alternative water supply infrastructure is a temporary response activity.

Hastings argues that because the EPA has approved removal actions at the FAR-MAR-CO subsite (i.e., the Well-D System) and the Second Street Subsite, Hastings' work on its water supply system should also be considered a removal action. (Hastings' Supp. Response Br., filing 261, at 18-19. See also Index, filing 298, Ex. 5, Sept. 20, 1995, EPA Action Memo.) It seems to me that Hastings' logic is flawed: the fact that removal actions have been approved at two subsites in the city does not suggest that the city's water supply infrastructure improvements are also removal actions.

Finally, Hastings argues that this suit is a "subsequent action" within the meaning of 42 U.S.C. § 9613(g)(2), and therefore it is timely even if the work Hastings performed on its water supply system is not deemed a "removal action." (Hastings' Response Br., filing 185, at 19.)

Section 9613(g)(2) states, "A subsequent action or actions under section 9607 of this title for further response costs at the . . . facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action." Because there is no dispute that the response action at issue here is ongoing, Hastings' suit is timely filed if, in fact, this section applies. The applicability of this section hinges on whether the instant suit is indeed a "subsequent action," as opposed to an "initial action" to recover costs under § 9607.

"[A] 'subsequent action' against a party can be brought only after an 'initial action' has

11

been brought against it." United States v. Navistar International Transportation Corp., 152 F.3d 702, 710 (7th Cir. 1998). There is no evidence that Hastings has ever previously brought a § 9607 cost recovery action against Dravo. Therefore, the instant action is not a "subsequent action" within the meaning of § 9613(g)(2).

Hastings argues that the instant action is "subsequent" to United States v. Dravo Corp., No. 8:01cv500 (D. Neb. 2001). (See Hastings' Response Br., filing 185, at 19.) But United States v. Dravo was not a cost recovery action brought by Hastings against Dravo, and therefore it does not make the instant case a "subsequent action" for response costs by Hastings against Dravo. See Navistar International Transportation Corp., 152 F.3d at 710 ("We believe that, from the language and structure of the statute, a 'subsequent action . . . for further response costs' must be one brought against the same party or parties against which an 'initial action' to recover such costs has been maintained.").

In United States v. Dravo, Dravo and Desco joined Hastings as a third-party defendant in an effort to seek contribution and indemnification from Hastings, and Hastings then filed a two-count counterclaim seeking contribution from Dravo and Desco pursuant to CERCLA, "the federal law of contribution," or "the common law and statutes of Nebraska." Hastings now asserts that its counterclaim in United States v. Dravo Corp. included a request for a declaratory judgment that Dravo was liable for costs under 42 U.S.C. § 9607, and therefore its counterclaim was in fact a cost recovery action. (Hastings Response Br., filing 185, at 20.) Hastings' argument is not persuasive. (See Hastings' Index, filing 186, Ex. I.) Although it is true that the counterclaim alleges that the court has the authority to issue a declaratory judgment pursuant to § 9613(g)(2)[7] and that Dravo is liable for response costs under § 9607,[8] the counterclaim clearly

---

[7] I note parenthetically that § 9613(g)(2)'s declaratory judgment provision has been held to apply to § 9613(f)(1), which allows PRPs to obtain declaratory judgments in contribution actions. See, e.g., United States v. Davis, 261 F.3d 1, 46 (1st Cir. 2001). Therefore, the counterclaim's reference to § 9613(g)(2) does not indicate that Hastings was bringing a cost recovery action.

[8] The counterclaim's reference to § 9607 is apt because "[t]he standard for contribution liability is the same as the standard for cost recovery liability." United States v. Davis, 261 F.3d 1, 29 (1st Cir. 2001). It does not indicate that Hastings' counterclaim for contribution was actually a cost-recovery action.

seeks contribution under § 9613(f). (See Hastings' Index, filing 186, Counterclaim, ¶¶ 4, 30, 33-34, 43, 46, see also id. at 8, 11.) Hastings' Notice of Filing Counterclaim in United States v. Dravo eliminates any uncertainty about the nature of the counterclaim. It states,

> The City now counterclaims against Dravo and Desco in two counts. Count I of the Counterclaim seeks contribution from Dravo and Desco for (1) damages and response costs the City has incurred at the Colorado Avenue Subsite and (2) any past or future damages and response costs the City incurs at the Colorado Avenue subsite in excess of its equitable share, if any. Count II seeks contribution from Dravo and Desco for past and future damages and response costs incurred by the City at other subsites . . . and for replacement of water system infrastructure. Specifically, under Count II the City seeks contribution (1) from Dravo and Desco to the extent hazardous substances migrating from the Colorado Avenue Subsite have contaminated other subsites, the Area Wide Operable Unit 19, and the City's water system and (2) from Dravo as a transporter and disposer of hazardous substances at two of the other subsites, the North Landfill Subsite and the South Landfill Subsite.

(Dravo's Reply Index, filing 211, Ex. I, Notice of Filing Counterclaim, ¶ 3.)

Hastings' counterclaim in United States v. Dravo was for contribution; it was not an initial action to recover response costs under § 9607. Hastings has submitted no authority, and I am aware of none, holding that a previously-filed counterclaim for contribution can serve as an initial § 9607 cost recovery action that renders an action such as the instant one a "subsequent action . . . under § 9607 . . . for further response costs" within the meaning of § 9613(g)(2).

The instant action is an initial action for recovery of the costs referred to in § 9607, and because the work that Hastings performed on its water supply system constitutes a "remedial action," Hastings was required to commence this suit "within 6 years after initiation of physical on-site construction of the remedial action." 42 U.S.C. § 9613(g)(2)(B). Hastings did not do so. Therefore, Hastings' CERCLA claims relating to its water supply system improvements are untimely, and Dravo is entitled to summary judgment on those claims.

### B. Negligence

Dravo argues that it is entitled to summary judgment on Hastings' negligence claim (Count IV) because Hastings did not file its claim within the four-year period specified in Nebraska's statute of limitations. (See Dravo's Br., filing 232, at 12-16.) I agree.

A four-year statute of limitations applies to negligence claims in Nebraska. See Neb. Rev. Stat. § 25-207; Reid v. Evans, 733 N.W.2d 186, 188 (Neb. 2007) (citing section 25-207 as "Nebraska's 4-year statute of limitations for negligence."). Generally, the "statute of limitations begins to run as soon as the claim accrues, and an action in tort accrues as soon as the act or omission occurs." Alston v. Hormel Foods, Corp., 730 N.W.2d 376, 381 (Neb. 2007) (footnote omitted). The Nebraska Supreme Court has held, however, "that in certain categories of cases, the statute of limitations begins to run on the date when the party holding the claim discovers or, in the exercise of reasonable diligence, should have discovered the existence of the injury." Id. (footnote omitted). Also, the "continuing tort doctrine" holds that "when an individual is subject to a continuing, cumulative pattern of tortious conduct, capable of being terminated and involving continuing injury, the statute of limitations does not run until the date of the last injury or cessassion of the wrongful action"–though it should be noted that claims for damages caused by a continuing tort are limited to injuries caused by conduct occurring within the statutory limitations period. Id. at 381, 383.

Hastings' negligence claim alleges that from 1965 to 1982, Dravo and its predecessor breached their duty to operate and maintain the Colorado Avenue facility in such a way as to prevent the release of TCE and TCA into the environment, and that the TCE emanating from that site continues to cause damages to Hastings. (See Am. Compl., filing 53, ¶¶ 81-91.) The undisputed facts show that Hastings knew, or should have known, about its injury no later than 1986. The continuing tort doctrine is inapplicable here because Dravo is not alleged to be engaged in "a continuing . . . pattern of tortious conduct . . . capable of being terminated." Alston, 730 N.W.2d at 381. On the contrary, there is no allegation that Dravo has engaged in negligent conduct since 1982.[9] Although Hastings alleges that TCE contamination continues to

---

[9]In its brief, Hastings argues that Dravo has engaged in "ongoing and continuous negligence" during "the last several years." (See Hastings Response Br., filing 185, at 25.) For example, Hastings argues that "Dravo has failed to comply with EPA requirements to conduct soil and soil gas sampling at the Colorado Avenue Subsite" and has "neglected to change the carbon in the IWA system for nearly two-and-a-half years." (Id.) Count IV is not based on such allegations, however: it plainly alleges that Dravo and its predecessor engaged in negligent acts between 1965 and 1982 which resulted in the release of contaminants. (See Am. Compl., filing 53, ¶¶ 81-91.)

14

harm the city, these allegations are insufficient to trigger the continuing tort doctrine. See Alston, 730 N.W.2d at 381 ("This 'continuing tort doctrine' requires that a tortious act–not simply the continuing ill effects of prior tortious acts–fall within the limitation period. Nor can the necessary tortious act merely be the failure to right a wrong committed outside the statute of limitations . . . .").

Hastings' negligence claim accrued more than four years before the instant action was filed. Dravo's motion for summary judgment on Count IV will therefore be granted.

### C.     Private and Public Nuisance

Dravo argues next that it is entitled to summary judgment on Hastings' private nuisance (Count V) and public nuisance (Count VI) claims on the ground that these claims, too, were not timely filed.

A four-year statute of limitations applies to public and private nuisance claims. See Neb. Rev. Stat. § 25-207. Hastings argues that its nuisance claims are timely filed under the continuing tort doctrine described above. (See Hastings Response Br., filing 185, at 26 (citing, inter alia, Alston v. Hormel Foods, Corp., 730 N.W.2d 376 (Neb. 2007)). For the reasons explained above, I must reject Hastings' argument. As the Nebraska Supreme Court explained in Alston, the requirements of a continuing tort are "a course of continuing wrongful conduct, capable of termination, causing continuing and repeated injury." 730 N.W.2d at 384. Furthermore, the "'continuing tort doctrine' requires that a tortious act–not simply the continuing ill effects of prior tortious acts–fall within the limitation period," and "the necessary tortious act [cannot] merely be the failure to right a wrong committed outside the statute of limitations." Id. at 381. There are no allegations, and there is no evidence, that Dravo has engaged in any wrongful conduct since 1982, which is beyond the limitation period. Under these circumstances, the continuing tort doctrine is not applicable. See Alston, 730 N.W.2d at 384 ("A 'continuing tort' ought not to be a rationale by which the statute of limitations policy can be avoided.").

Hastings cites cases from other jurisdictions, including Hoery v. United States, 64 P.3d 214 (Colo. 2003), for the proposition that liability for trespass and nuisance is continuing as long as a harmful physical condition persists–even if the defendant created the harmful condition in

15

the past, and its activities have ceased. (See Hastings Response Br., filing 185, at 26-27.) These holdings are in direct conflict with the Nebraska Supreme Court's holding in Alston that "continuing ill effects of prior tortious acts" and "the failure to right a wrong committed outside the statute of limitations" are insufficient to establish a continuing tort.

I find that Dravo is entitled to summary judgment on Hastings' nuisance claim.

### D. Trespass

Dravo also argues that Hastings' trespass claim (Count VII) is "time barred for the same reasons as the nuisance and negligence counts." (Dravo's Br., filing 232, at 23.) I agree. Once again, Hastings relies on Nebraska's continuing tort doctrine and a set of cases from other jurisdictions in support of its argument that its trespass claim was timely filed. (See Hastings Response Br., filing 185, at 26-27.) For the reasons explained above, because there is no evidence that Dravo committed a trespass within the statutory limitations period,[10] the continuing tort doctrine is inapplicable.

Hastings was aware of Dravo's alleged trespass long ago, but failed to file its cause of action against Dravo within the statutory limitations period. Dravo's motion for summary judgment on Hastings' trespass claim will be granted.

### E. Claims for Injunctive Relief

Dravo also argues that it is entitled to summary judgment on Hastings' claims for injunctive relief in Counts V, VI, and VII, "whether or not the City's damages claims are time-barred," "on the grounds of mootness and res judicata." (Dravo's Br., filing 232, at 21, 22.) Because I have found that Dravo is entitled to summary judgment on these counts, injunctive relief will not be available to Hastings through them.

**IT IS ORDERED** that "Dravo Corporation's Motion for Partial Summary Judgment on the City of Hastings' Claims Related to Its Water Supply System," filing 110, is granted. Dravo is entitled to summary judgment on Counts IV, V, VI, and VII, and on Counts I and II to the

---

[10] A four-year statute of limitations applies to actions "for trespass upon real property." Neb. Rev. Stat. § 25-207(1).

extent they involve a claim for damages involving Hastings' water supply system.

Dated November 24, 2009.

BY THE COURT

s/ Warren K. Urbom
United States Senior District Judge