IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MORRISON ENTERPRISES, LLC, and CITY OF HASTINGS, Nebraska, | ) ) ) | 4:08CV3142 |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | MEMORANDUM AND ORDER ON DRAVO CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE PLAINTIFFS' CLAIMS RELATED TO THE WELL D SYSTEM |
| DRAVO CORPORATION, | ) ) | |
| Defendant. | ) ) ) | |

Now before me is "Dravo Corporation's Motion for Partial Summary Judgment on Morrison Enterprises, LLC and the City of Hastings' Claims Related to the Well D System," filing 154. For the following reasons, Dravo Corporation's motion will be granted in part.

## I.  BACKGROUND

On June 10, 1986, the United States Environmental Protection Agency (EPA) added the Hastings Ground Water Contamination Site (HGWCS) to the National Priority List.[1] (Dravo's Br., filing 168, Statement of Material Facts (Facts) ¶ 1.) In 1985 and 1986, the EPA notified a number of entities, including Morrison Enterprises, LLC (Morrison), the City of Hastings, Nebraska (Hastings), and Dravo Corporation (Dravo), that they were potentially liable as responsible parties under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 et seq., for releases and threatened releases of contaminants at the HGWCS. (Dravo's Br., filing 268, Facts ¶ 2 (citing Am. Compl., filing 53, ¶ 23).) More specifically, the EPA determined that the contamination at the HGWCS originated from several source areas, or subsites; Morrison was identified as a potentially responsible party (PRP) at the FAR-MAR-CO Subsite; Dravo and others were identified as PRPs

---

[1]"The National Priorities List is a national list of hazardous waste sites posing the greatest threat to health, welfare and the environment." (Dravo's Index, filing 164, Ex. O, ¶ 15.)

1

at the Colorado Avenue Subsite; and Hastings, Dravo, and others were identified as PRPs at the North Landfill Subsite.  (E.g., Morrison's Br., filing 248, at 10 ¶ 2 (citing Answer, filing 63, ¶¶ 23-26).)

There is some disagreement about the contaminants that each party is responsible for at each of the various subsites.  Morrison claims that the only contaminants of concern (COCs) for which it is a PRP are carbon tetrachloride (CT) and ethylene dibromide (EDB).  (Morrison's Response Br., filing 248, Additional Material Facts ¶ 3; see also Morrison's Response Br., filing 248, at 5 (describing Morrison's release of CT and EDB into the environment).)  It adds that trichloroethylene (TCE) "has never been used, released, or otherwise discharged by Morrison anywhere within the HGWCS," and "[t]he FAR-MAR-CO Subsite . . . has never been identified as a source of TCE."  (Id. ¶¶ 1-2; see also id. ¶ 31.)  There appears to be no dispute that Dravo is responsible for releases of TCE at the Colorado Avenue Subsite.  (E.g., id. ¶¶ 12-15.)  However, Dravo disputes Morrison's claim that the FAR-MAR-CO Subsite is not a source of TCE.  In support of its position, Dravo refers me to evidence indicating that "TCE has been detected in both shallow soil and soil-gas samples collected at the [FAR-MAR-CO] subsite which suggests potential on-subsite releases."  (Dravo's Reply Br., filing 269, at 2 ¶ 1 (citing, inter alia, Index, filing 235, Attach. 3, Ex. C at 3).)  Finally, although there is no dispute that Hastings is a PRP at the North Landfill Subsite, there is no evidence that Hastings itself ever released contaminants at the subsite.

In 1988, PRC Environmental Management Inc. prepared a report for the EPA entitled, "Engineering Evaluation/Cost Analysis for an Expedited Response Action for Soils/Ground Water Far Mar Co Subsite, Hastings Ground Water Contamination Site, Hastings Nebraska." (Dravo's Index, filing 156, Ex. A at HAR 3113.)  The report, which is referred to by the parties as "the 1988 EE/CA," states, "The objectives of the [Expedited Response Action] are to develop evaluate and implement a response action for the site contamination."  (Id. at HAR 3114.)  The report also states, "The preferred response action alternative for contaminated ground water includes pumping and treatment by liquid phase granular activated carbon (GAC) adsorption (Alternative 1)."  (Id. at HAR 3206.)  It adds, "A ground water extraction system will be designed to capture the contaminated ground water plume to minimize its migration off site.  The

2

extracted ground water will be pumped to an on site treatment facility which will be located in the general vicinity of the subsite."  (Id.)

In January 1991, Morrison Knudson Corporation prepared a "Final Work Plan for a Ground Water Remedial Investigation/Feasibility Study at the FAR-MAR-CO Subsite." (Dravo's Index, filing 156, Ex. B at DVD 053333.)  This Plan, which was "written in response to EPA's Work Assignment 16-7LS2, Initial Revision," "identifies the scope of work and schedule for a ground water Remedial Investigation/Feasibility Study (RI/FS) at the FAR-MAR-CO subsite."  (Id. at DVD 053337.)  A similarly-titled "Final Work Plan" was prepared in August 1991 for Morrison Enterprises by S.S. Papadopulos & Associates.  (Dravo's Index, filing 157, Ex. C at MOR022202.)  On November 19, 1991, the EPA and Morrison voluntarily entered into an Administrative Order on Consent (AOC) concerning "the completion of the remedial investigation (RI), preparation of the feasibility study (FS), and reimbursement for all costs incurred by EPA in connection with the RI/FS for the ground water operable unit at the FAR-MAR-CO Subsite."  (Dravo's Index, filing 157, Ex. D at MOR022160.)  Hastings was not a party to the 1991 AOC.

In June 1995, Morrison, Hastings, and the Dutton-Lainson Corporation (Dutton-Lainson) entered into an agreement entitled "FAR-MAR-CO/North Landfill PRP Agreement."  (Dravo's Index, filing 159, Ex. F, at CITY 002411.)  The purpose of the agreement was to "control the manner and means by which the Members" would:

>     (a) organize and conduct a common response action to groundwater contamination allegedly associated with releases of hazardous substances from the Sites . . .; (b) conduct necessary site investigation, remedial action selection, and implementation and oversight of the Response Action; (c) organize and conduct negotiations with the [EPA] or any other persons concerning the Response Action; . . . and (g) allocate among themselves all costs incurred or to be incurred as authorized by this Agreement, including but not limited to legal, technical, administrative and other costs . . . .

(Id. at CITY 002413.)  In this Agreement, the Members (i.e., Morrison, Hastings, and Dutton-Lainson) agreed to share certain costs associated with the investigation and cleanup of alleged releases of hazardous substances from the North Landfill and FAR-MAR-CO Subsites.  (Am. Compl., filing 53, ¶ 30.)

3

The 1991 AOC was amended in September 1995.  (See Dravo's Index, filing 160, Ex. G.)
The amendment "concern[ed] preparation of the engineering evaluation and cost analysis
(EE/CA) and reimbursement for all costs incurred by EPA in connection with the EE/CA for the
ground water operable unit at the FAR-MAR-CO Subsite located in Hastings, Nebraska."  (Id. at
2.)  S.S. Papadopulos & Associates then prepared an EE/CA report for Morrison and Hastings
dated October 1995.  (Dravo's Index, filing 160, Ex. H at MOR015515.)  This report concludes
that the recommended removal action for the FAR-MAR-CO Subsite is "extracting contaminated
ground water and directly disposing of it to an end user."  (Id. at MOR015517, MOR015519.)
The EPA then issued an Action Memorandum "to request and document approval of the
proposed non-time critical removal action, including an exemption to the statutory limit of
twelve months, for the FAR-MAR-CO Subsite."  (Dravo's Index, filing 161, Ex. I at CM/ECF
page 4.)[2]  The Action Memorandum, which appears to be dated December 1995, states,

> The objective of the removal action is to abate the release or threat of release of
> hazardous substances contained within the ground water by using pumping to
> remove the contaminated ground water and disposal of the ground water in nearby
> industrial facilities.  The removal action will exceed the one year statutory limit
> for Fund-lead removals.  However, the [EPA] anticipates this action will be
> performed by Morrison Enterprises.

(Id.)  The memorandum states specifically that it "selects the preferred removal action identified
by Morrison in the EE/CA" of 1995.  (Id. at 11 (CM/ECF page 14).  See also Morrison's
Response Br., filing 248, Additional Material Facts ¶ 6 ("In December of 1995 . . . the EPA
issued an Action Memorandum, selecting extraction and treatment as a removal action to address
the threat posed by the contaminated ground water migrating from the [FAR-MAR-CO] Subsite .
. . .").)

In June 1996, the EPA and Morrison voluntarily entered into an AOC that "require[d]
[Morrison] to conduct the removal action described [therein] to abate an imminent and
substantial endangerment to the public health, welfare or the environment that may be presented

---

[2]"CM/ECF page x" refers to the page number appearing in the heading imposed on the
exhibit by the court's CM/ECF system.  Because these page numbers do not appear on the
exhibits themselves, I shall only cite to CM/ECF pages when documents lack other clear page
designations.

by the actual or threatened release of hazardous substances at or from the FAR-MAR-CO subsite." (Dravo's Index, filing 161, Ex. J at DVD 050995.) The 1996 AOC required Morrison to design, install, and operate "a ground water extraction system capable of pumping at least 800 gallons per minute and the disposal of the extracted ground water in a nearby industrial facility." (Id. at DVD 051010.) The parties refer to this extraction system as the Well D system. (E.g., Am. Compl., filing 53, ¶ 33; Morrison's Response Br., filing 248, Additional Material Facts ¶ 9.)

On July 3, 1997, Morrison, Hastings, and other parties entered into a "Well D System Operating Agreement." (Dravo's Index, filing 161, Ex. K.) The Agreement states that the parties to the Agreement have "undertaken to perform those obligations described in the [1996] AOC, specifically, to construct and operate an extraction well and transmission line to deliver approximately 600 gallons of water per minute for nonpotable use as cooling water at the Whelan Energy Center owned and operated by Hastings Utilities." (Id. at CITY 002407.) The Well D System was put into operation, and it has been in operation since 1997. (E.g., Morrison's Br., filing 248, at 17 ¶ 16.)

In September 2007, the EPA issued a Record of Decision (ROD) for the FAR-MAR-CO Subsite. (Dravo's Index, filing 164, Ex. N.) The Declaration for the 2007 ROD states that it "presents the selected remedy for Operable Unit 6 (OU 6) of the FAR-MAR-CO Subsite (Subsite), Hastings Groundwater Contamination Site . . . , located in Hastings, Nebraska." (Id. at MOR016030.) It adds,

> The selected remedy is intended to be the final response action for the Subsite and addresses all contamination associated with the principal threats posed by the Subsite OU 6. Specifically, the selected remedy addresses volatile organic compound (VOC) contamination identified in the ground water at the Subsite.
>
> The major components of the selected remedy include:
>
> • Ground Water Extraction at Well D, Chief Ethanol and the Whelan Energy Center (WEC) – Treatment of the extracted water is provided in its use as non-contact cooling water or in other industrial processes.
> • Enhanced In Situ Bioremediation in Source Area – A single injection well will be installed upgradient of MW-8, in the source area for carbon tetrachloride (CT) and ethylene dibromide (EDB)

5

> contamination.  A nutrient-rich solution will be injected for the
> purposes of altering the ground water geochemical environment to
> enhance reductive dehalogenation of CT and EDB.

(Id. (emphasis added).)

On July 29, 2008, the United States (acting at the request of the Administrator of the
EPA) filed a civil action under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607,
against Morrison and Cooperative Producers, Inc.  (Dravo's Br., filnig 168, Facts ¶ 20;
Morrison's Response Br., filing 248, at 19 ¶ 20; Dravo's Index, filing 164, Ex. O ¶ 1.)  See also
United States v. Morrison Enterprises, LLC, No. 8:08cv332 (D. Neb. July 29, 2008) (complaint).
In this action, the United States sought "an order requiring the Defendants to implement the
EPA's selected environmental remedy for Operable Unit 6 ("OU6") of the Hastings Ground
Water Contamination Site . . . and requiring the Defendants to reimburse the United States,
pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for costs incurred, and to be
incurred, in response to releases and threatened releases of hazardous substances into the
environment at and from the FAR-MAR-CO Subsite of the Hastings Groundwater Site."
(Dravo's Index, filing 164, Ex. O ¶ 2.)  This action was resolved by a consent decree filed on
October 1, 2008.  (Dravo's Index, filing 165, Ex. P.)  "By entry into the 2008 Consent Decree,
Morrison obligated itself to perform response actions set forth in the 2007 ROD, including the
operation of the Well D System, enhanced in situ bioremediation near source zone, and
implementation of an expanded monitoring program, including the installation of additional
monitoring wells."  (Morrision's Response Br., filing 248, at 20.)  Hastings was not a signatory
to the consent decree.

There appears to be no dispute that Well D System is capturing TCE; the parties disagree
about the source or sources of this TCE and which party or parties bear responsibility for it.
(Compare Morrison's Response Br., filing 248, Additional Material Facts ¶¶ 17-19 with Dravo's
Reply Br., filing 269, at 3-4 ¶¶ 17-19.)

On February 24, 2009, Morrison and Hastings filed an eight-count amended complaint
against Dravo.  (See generally filing 53.)  Counts I-III are brought by the plaintiffs jointly, and
Counts IV-VIII are brought by Hastings alone.  Count I alleges that the plaintiffs are entitled to a
"recovery of response costs pursuant to 42 U.S.C. § 9607(a)."  (See Am. Compl., filing 53, ¶¶

6

46-67.)  Count II alleges that the plaintiffs are entitled to "a declaratory judgment . . . for response costs incurred, and future response costs or damages to be incurred, as a result of the release or threatened release of hazardous substances."  (Id. ¶ 69 (citing, inter alia, 42 U.S.C. § 9613(g)(2)).)  Count III, titled "Non-contractual Indemnity," alleges that the defendant should bear "the costs associated with the remediation of TCE contamination emanating from the Colorado Avenue Subsite."  (Id. ¶ 80.)  Counts IV, V, VI, VII, and VIII are titled "Negligence," "Private Nuisance," "Public Nuisance," "Trespass," and "Breach of Contract," respectively.  (See generally id.)  Counts IV-VIII are not within the scope of the instant motion for summary judgment.

## II.   STANDARD OF REVIEW

A motion for summary judgment shall be granted by the court "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A "material" fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party.  Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).  If the moving party meets the initial burden of establishing the nonexistence of a genuine issue, then the burden shifts to the nonmoving party to produce evidence of the existence of a genuine issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment," Anderson, 477 U.S. at 257, and "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial," id. at 256 (citing Fed. R. Civ. P. 56(e)).

## III.   ANALYSIS

Dravo argues that it is entitled to a partial summary judgment on Morrison's and

Hastings' claims related to the Well D System.  (See Dravo's Br., filing 168, at 1.)  It also argues that Count III of the amended complaint ought to be dismissed.  (See id. at 1-2.)  My analysis of Dravo's arguments is set forth below.

## A.   Whether the Plaintiffs' Well D Claims Are Properly Brought Under CERCLA Section 107(a) Rather than Section 113(f)

Dravo argues first that Morrison's and Hastings' claims under CERCLA section 107(a), 42 U.S.C. § 9607(a), are "improper" because "PRPs who have entered into an administrative or judicially approved settlement must seek contribution under [CERCLA section] 113(f)," 42 U.S.C. § 9613(f), rather than section 107(a).  (Dravo's Br., filing 168, at 8.)

As the Supreme Court noted in United States v. Atlantic Research Corp., 551 U.S. 128, 131 (2007), "Courts have frequently grappled with whether and how PRPs may recoup CERCLA-related costs from other PRPs."

> Section 107(a) defines four categories of PRPs, 94 Stat. 2781, 42 U.S.C. §§ 9607 (a)(1)-(4), and makes them liable for, among other things:
>
> > "(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; [and]
> >
> > "(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan." § 9607(a)(4)(A)-(B).
>
> Enacted as part of the Superfund Amendments and Reauthorization Act of 1986 (SARA), 100 Stat. 1613, § 113(f) authorizes one PRP to sue another for contribution in certain circumstances. 42 U.S.C. § 9613(f).

Atlantic Research Corp., 551 U.S. at 131-32 (footnote omitted).  More specifically, § 113(f)(1) "permits private parties to seek contribution during or following a civil action under § 106 or § 107(a)," and § 113(f)(3)(B) provides that "[a] person who has resolved its liability to the United States . . . for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2)."

Prior to the advent of § 113(f)'s express contribution right, some courts

> held that § 107(a)(4)(B) provided a cause of action for a private party to recover voluntarily incurred response costs and to seek contribution after having been sued.  After SARA's enactment, however, some Courts of Appeals believed it necessary to "direc[t] traffic between" § 107(a) and § 113(f).  As a result, many Courts of Appeals held that § 113(f) was the exclusive remedy for PRPs.  But as courts prevented PRPs from suing under § 107(a), they expanded § 113(f) to allow PRPs to seek "contribution" even in the absence of a suit under § 106 or § 107(a).

Atlantic Research Corp., 551 U.S. at 132 (citations omitted).

In Atlantic Research Corp., the Supreme Court held that "§ 107(a) provides [PRPs] with a cause of action to recover costs from other PRPs," 551 U.S. at 131 (citation omitted), thereby abrogating circuit decisions holding that § 113(f) was the exclusive remedy for PRPs.  The Court's holding does not mean, however, that all PRPs, regardless of their procedural circumstances, can choose to proceed under § 107(a), § 113(f), or both.  The Court explained,

> We have previously recognized that §§ 107(a) and 113(f) provide two "clearly distinct" remedies.  "CERCLA provide[s] for a right to cost recovery in certain circumstances, § 107(a), and separate rights to contribution in other circumstances, §§ 113(f)(1), 113(f)(3)(B)." . . . .
>
> Section 113(f) explicitly grants PRPs a right to contribution.  Contribution is defined as the "tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault."  Nothing in § 113(f) suggests that Congress used the term "contribution" in anything other than this traditional sense.  The statute authorizes a PRP to seek contribution "during or following" a suit under § 106 or § 107(a).  Thus, § 113(f)(1) permits suit before or after the establishment of common liability.  In either case, a PRP's right to contribution under § 113(f)(1) is contingent upon an inequitable distribution of common liability among liable parties.
>
> By contrast, § 107(a) permits recovery of cleanup costs but does not create a right to contribution.  A private party may recover under § 107(a) without any establishment of liability to a third party.  Moreover, § 107(a) permits a PRP to recover only the costs it has "incurred" in cleaning up a site.  When a party pays to satisfy a settlement agreement or a court judgment, it does not incur its own costs of response.  Rather, it reimburses other parties for costs that those parties incurred.
>
> Accordingly, the remedies available in §§ 107(a) and 113(f) complement each other by providing causes of action "to persons in different procedural

9

circumstances."  Section 113(f)(1) authorizes a contribution action to PRPs with common liability stemming from an action instituted under § 106 or § 107(a).  And § 107(a) permits cost recovery (as distinct from contribution) by a private party that has itself incurred cleanup costs.  Hence, a PRP that pays money to satisfy a settlement agreement or a court judgment may pursue § 113(f) contribution.  But by reimbursing response costs paid by other parties, the PRP has not incurred its own costs of response and therefore cannot recover under § 107(a).  As a result, though eligible to seek contribution under § 113(f)(1), the PRP cannot simultaneously seek to recover the same expenses under § 107(a).  Thus, at least in the case of reimbursement, the PRP cannot choose the 6-year statute of limitations for cost recovery actions over the shorter limitations period for § 113(f) contribution claims.

551 U.S. at 138-39 (citations omitted footnotes omitted).

The Court largely left open the question whether PRPs are able to bring § 107(a) claims for cost recovery under the "procedural circumstances" presented in the instant case:

We do not suggest that §§ 107(a)(4)(B) and 113(f) have no overlap at all.  For instance, we recognize that a PRP may sustain expenses pursuant to a consent decree following a suit under § 106 or § 107(a).  In such a case, the PRP does not incur costs voluntarily but does not reimburse the costs of another party.  We do not decide whether these compelled costs of response are recoverable under § 113(f), § 107(a), or both.  For our purposes, it suffices to demonstrate that cost incurred voluntarily are recoverable only by way of § 107(a)(4)(B), and costs of reimbursement to another person pursuant to a legal judgment or settlement are recoverable only under § 113(f).

551 U.S. at 139 n.6 (emphasis added).

In the wake of Atlantic Research Corp., a number of courts have analyzed one of the questions left open by the Supreme Court, i.e., whether PRPs that have been compelled to incur costs pursuant to an administrative or judicially-approved settlement are able to assert § 107(a) claims or are limited to bringing contribution claims under § 113(f).  See, e.g., ITT Industries, Inc. v. BorgWarner, Inc., 615 F. Supp. 2d 640 (W.D. Mich. 2009); Appleton Papers Inc. v. George A. Whiting Paper Co., 572 F. Supp. 2d 1034 (E.D. Wis. 2008); Niagara Mohawk Power Corp. v. Consolidated Rail Corp., 565 F. Supp. 2d 399 (N.D.N.Y. 2008); New York v. Next Millennium Realty, LLC., No. CV-03-5985(SJF)(MLO), 2008 WL 1958002 (E.D.N.Y. May 2, 2008); W.R. Grace & Co.-Conn. v. Zotos International, Inc., 559 F.3d 85 (2d Cir. 2009).  The prevailing view, generally stated, is that Atlantic Research Corp. overruled circuit precedents to

10

the extent that they held that actions between PRPs can <u>only</u> be brought pursuant to § 113(f), but circuit cases remain viable insofar as they hold that claims for costs incurred pursuant to consent decrees or administrative settlement agreements must be brought under § 113(f).  As the district court explained in <u>ITT Industries, Inc.</u>,

> Prior to <u>Atlantic Research</u> the law in the Sixth Circuit and in most other circuits was that a claim for costs incurred in performing a cleanup pursuant to a judicial or administrative settlement is limited to a contribution action under § 113(f).  Although <u>Atlantic Research</u> overruled decisions holding that a PRP could never assert a § 107 claim, <u>Atlantic Research</u> did not overrule decisions holding that claims for costs incurred in performing a cleanup pursuant to a judicial or administrative settlement are limited to a contribution action under § 113(f).

615 F. Supp. 2d at 646 (citations omitted).  <u>See also</u> <u>Niagara Mohawk Power Corp.</u>, 565 F. Supp. 2d at 402; <u>Next Millennium Realty, LLC.</u>, 2008 WL 1958002, at *6-7.  Put another way, a PRP can bring a claim under § 107(a) if it is foreclosed from bringing a claim under § 113(f), but that, conversely, a PRP <u>must</u> proceed under § 113(f) if § 113(f) is available to it.  <u>See</u> <u>ITT Industries, Inc. v. BorgWarner, Inc.</u>, 506 F.3d 452, 458 (6th Cir. 2007) ("To maintain the vitality of § 113(f), however, PRPs who have been subject to a civil action pursuant to §§ 106 or 107 or who have entered into a judicially or administratively approved settlement must seek contribution under § 113(f)."); <u>Appleton Papers Inc.</u>, 572 F. Supp. 2d at 1043 ("In cases where a claim for contribution can be asserted under § 113(f), § 107(a) cannot be used.  This makes sense for the reasons noted by the Third Circuit in <u>Bedford Affiliates v. Sills</u>[, 156 F.3d 416, 424 (2d Cir. 1998)]: 'Were we to permit a potentially responsible person to elect recovery under either § 107(a) or § 113(f)(1), § 113(f)(1) would be rendered meaningless . . . .  A recovering liable party would readily abandon a § 113(f)(1) suit in favor of the substantially more generous provisions of § 107(a).'  At the same time, parties who do not have access to § 113(a) [sic], either because they are completely innocent and do not share common liability with any PRPs, or because the Government has not brought an enforcement action, must be allowed to recover under § 107(a) if injustice is to be avoided." (citation omitted).).

In <u>W.R. Grace & Co.-Conn.</u>, 559 F.3d at 91-94, the Second Circuit held that a plaintiff could bring a § 107(a) claim, even though its expenditures were made in compliance with a consent order, because the consent order did not resolve the plaintiff's liability under CERCLA.

The court noted, "The relevant inquiry with respect to section 107(a) is whether the party undertook the remedial actions without the need for the type of administrative or judicial action that would give rise to a contribution claim under section 113(f)." Id. at 94.  Because the plaintiff "chose to enter into an agreement with the state to investigate and remediate a contaminated site," thereby saving "the parties and the government litigation costs, and presumably also limited ongoing contamination by promptly remediating the site," it was not precluded from bringing an action pursuant to § 107(a).  Id.  It is noteworthy, however, that in W.R. Grace & CO.-Conn., the plaintiff sought "to recover costs for remediation it performed itself; it [did] not seek to recoup expenses incurred in satisfying a settlement agreement or a court judgment." 559 F.3d at 93.  The court also stated specifically that it was not called upon to determine whether a party that enters into a consent decree following a suit under CERCLA §§ 106 or 107(a) has a cause of action under § 107(a).  See 559 F.3d at 93 n.7.

It should be noted also that the Supreme Court's decision in Atlantic Research Corp. affirmed the Eighth Circuit's decision in Atlantic Research Corp. v. United States, 459 F.3d 827 (8th Cir. 2006), and in its decision, the Eighth Circuit stated specifically that "liable parties which have been subject to §§ 106 or 107 enforcement actions are still required to use § 113, thereby ensuring its continued vitality." 459 F.3d at 836-37.  It also stated that parties have a right to bring a § 107(a) action if they "have incurred necessary costs of response, but have neither been sued nor settled their liability under §§ 106 or 107." Id. at 835.  Thus, it seems very likely that the Eighth Circuit would agree with the Sixth Circuit's conclusion that "PRPs who have been subject to a civil action pursuant to §§ 106 or 107 or who have entered into a judicially or administratively approved settlement must seek contribution under § 113(f)." ITT Industries, Inc., 506 F.3d at 458.

With this legal background in mind, I shall analyze Dravo's arguments that Morrision's and Hastings' claims related to the Well D System are claims that cannot properly be brought under CERLCA § 107(a).

1.    Morrison

Dravo argues that Morrision cannot bring a § 107(a) claim to recover costs related to the Well D System because those costs were incurred "pursuant to administrative and judicially

approved settlements with the EPA, including a consent decree." (Dravo's Br., filing 168, at 11.)
Dravo specifically refers me to the 1991 AOC, the September 1995 amendment to the 1991
AOC, the June 1996 AOC, and the October 2008 Consent Decree in United States v. Morrison
Enterprises, LLC, No. 8:08cv332 (D. Neb. Oct. 1, 2008). I agree with Dravo that § 107(a) is not
available to Morrison under the circumstances presented here. Morrison is a "liable party [that
has] been subject to [a] §§ 106 [and] 107 enforcement action," and therefore Morrison is
"required to use § 113." Atlantic Research Corp. v. United States, 459 F.3d 827, 836-37 (8th Cir.
2006). As I noted above, United States v. Morrison Enterprises, LLC, No. 8:08cv332 (D. Neb.
July 29, 2008) was resolved by a consent decree that, among other things, obligated Morrison to
operate the Well D System. Also, Morrison does not dispute Dravo's argument that the 1991
AOC, the 1995 amendment to the AOC, and the June 1996 AOC constitute "administratively
approved settlements" within the meaning of CERCLA § 113(f)(3)(B); nor does Morrison
dispute that the Well D-related costs that it seeks to recover in this action stemmed from these
settlements. (See Morrison's Response Br., filing 248, at 27.)[3] Given these facts, Morrison
ought to have sought contribution under § 113(f), and it cannot "evade . . . the allocation scheme
of a § 113(f) contribution claim under the guise of a § 107(a) cost recovery action." ITT
Industries, Inc. v. BorgWarner, Inc., 615 F. Supp. 2d 640, 646 (W.D. Mich. 2009).

    In opposition to Dravo's motion, Morrison argues that it cannot proceed under § 113(f)
"because there exists no common liability between it and Dravo," and therefore it must be
allowed to proceed under § 107(a). (See Morrison's Response Br., filing 248, at 28, 30.) More
specifically, Morrison contends that because "Dravo and Morrison are responsible for releases of
entirely different wastes," Morrison cannot maintain a contribution action against Dravo. (Id. at
28.)

    For the purposes of the instant motion, I shall assume that Dravo and Morrison are indeed

---

[3]In a reply brief submitted in support of its motion for partial summary judgment on
liability, Morrison argues that "a party incurring response costs pursuant to an administrative
consent order may assert a cost recovery action under CERCLA § 107(a)." (Morrison's Reply
Br., filing 267, at 5.) I address this argument in my Memorandum and Order on Plaintiffs'
Motion for Summary Judgment on Liability. Because this argument has not been submitted in
connection with the instant motion, however, I shall not repeat my analysis of it here.

responsible for releases of completely different wastes.[4]  However, Morrison has referred me to no authority stating that a PRP cannot bring a claim for contribution against another PRP when the two PRPs are responsible for releases of different substances.  Examples of contribution cases that undermine Morrison' argument (i.e., cases wherein liability was allocated between PRPs who were found responsible for releases of different substances) are readily available.  See, e.g., Control Data Corp. v. S.C.S.C. Corp., 53 F.3d 930, 938 (8th Cir. 1995) (affirming district court's decision to allocate responsibility between two PRPs based on the relative toxicity of the distinct substances that the PRPs were responsible for releasing). In short, I find no merit in the argument advanced by Morrison.

In light of the procedural circumstances facing Morrison, Morrison cannot bring a claim to recover response costs associated with the Well D System pursuant to CERCLA § 107.  I find, therefore, that Dravo's motion for summary judgment on Morrison's claims related to the Well D System will be granted.

2.    Hastings

Dravo argues that Hastings cannot bring a § 107(a) claim to recover costs related to the Well D System for the same reason that prevents Morrison from bringing such a claim, i.e., those costs were incurred "pursuant to administrative and judicially approved settlements with the EPA, including a consent decree."  (Dravo's Br., filing 168, at 11.)  In response, Hastings argues that it was not "a participant in any of the administrative orders on consent or the judicially approved settlement relied upon by Dravo," and it claims that it has "voluntarily" shared in the costs of construction and operation of the Well D System with Morrison and Dutton-Lainson Corporation.  (Hastings' Response Br., filing 254, at 21-22.)

In reply, Dravo notes that Hastings argues in another filing that it "is seeking contribution protection under CERCLA § 113 from Dravo," and it submits that Hastings "cannot be both a voluntary party and a party that has settled its liability with the government."  (Dravo's Reply Br., filing 269, at 14.)  In other words, Dravo argues that "[t]he City's acknowledgement [sic] that it has settled its liability with EPA contradicts and defeats its § 107 claim."  (Id.)

---

[4]As I noted in section I above, there appears to be a dispute whether Morrison is in fact responsible for releases of TCE at the FAR-MAR-CO Subsite.

CERCLA § 113(f)(2) states, "<u>A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement</u> shall not be liable for claims for contribution regarding matters addressed in the settlement." (Emphasis added). Although Hastings claims here that it has been operating the Well D system "voluntarily," i.e., without any establishment of liability to a third party through a judgment or court order, (<u>see</u> Hastings' Br., filing 254, at 21-22 & n.3), it argues elsewhere that it is entitled to contribution protection under § 113(f)(2) because it has entered into settlements that resolve its liability with the United States concerning the design and operation of the Well D System.

When arguing in support of its motion for summary judgment on Dravo's Counterclaims I-IV (filing 171), Hastings states,

> The primary basis for this Motion is that the United States District Court for the District of Nebraska and the Environmental Protection Agency ("EPA") have each entered orders in related proceedings that bar Dravo's Counterclaims. In March 2006, Judge Bataillon of this Court entered two orders approving the Settlement and Release Agreement ("Settlement Agreement") entered between the City and Dravo in <u>United States v. Dravo Corporation</u>, case number 8:01CV500, resolving Dravo's third-party CERCLA contribution claims against the City. <u>The City has also entered into a series of administrative and/or judicially approved settlements with EPA with regard to the North Landfill Subsite of the HGWCS. Each of these settlements contain provisions protecting the City from claims for contribution pursuant to the provisions of CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2).</u>

(Hastings' Br., filing 173, at 1-2 (emphasis added).) A number of the statements of material facts submitted by Hastings in that brief merit quotation:

> 10.   On November 15, 2007, the Court entered an RD/RA Consent Decree ("2007 Consent Decree") in <u>U.S. v. City of Hastings, et al.</u>, Civil Action No. 07-365 (D. Neb.) (Strom, J.), with respect to the North Landfill Subsite of the HGWCS. The City was one of the Settling Defendants participating in the 2007 Consent Decree. The Consent Decree declared, in part:

>> The Parties agree, and by entering this Consent Decree this Court finds, that the <u>Settling Defendants and the Settling Federal Agency are entitled, as of the Effective Date, to protection from contribution actions or claims as provided by CERCLA Section 113(f)(2), 42 U.S.C. 9613(f)(2), for matters addressed in this Consent Decree.</u> Matters addressed means the Work required by this Consent Decree and the Past and Future Response Costs, as

15

defined herein.

2007 Consent Decree (Index of Evidence, Exhibit E) at 41, ¶ 99.

    11.    The Statement of Work for the 2007 Consent Decree provided:

The Subsite has been divided into two operable units: (1) OU 10 addresses the soil at the Subsite; and (2) OU 2 addresses the ground water associated with the Subsite.  The Remedial Action to address the contaminated ground water is the subject of the CD [Consent Decree] and this SOW [Statement of Work] and is expected to be the final response action selected for the Subsite.

Statement of Work of the 2007 Consent Decree (Ex. E), Appendix B at 2, § I, ¶ B.

    12.    The Statement of Work also addressed Well D:

<u>Settling Defendants shall coordinate by periodic oral or written communication with responsible parties at the FAR-Mar-Co Subsite, and with officials at Chief Ethanol to ensure the continued operation of Well D</u> (presently operated by the City of Hastings and others) Wells IN-05 and IN-11 (presently operated by Chief Ethanol), and Wells A, B, and C (presently operated by the City of Hastings at the Whelan Energy Center).  <u>These wells, depicted in Appendix C to the CD, provide hydraulic containment of the impacted ground water plume associated with the Subsite to contain the migration of volatile organic compounds (VOCs) exceeding target concentrations in the ground water. [The cessation of operation or impairment of any of these wells will require a modification to this SOW, consistent with Paragraph 14 of the CD.[5]]</u>

Statement of Work of the 2007 Consent Decree (Ex. E), Appendix B at 4-5, § II, ¶ B.

(Hastings Br., filing 173, at 7-8 (emphasis added).)  In the reply brief filed by Hastings in support of its motion for summary judgment on Dravo's counterclaims, Hastings accurately sums up the Consent Decree, and its implications, thusly:

    Accordingly, the "matters addressed" in the Consent Decree require the

---

[5]This final sentence was not included in the statement of facts set forth in Hastings brief (filing 173 at 8), but is emphasized by Hastings in its Reply brief (filing 264 at 8).

> parties to <u>finance and perform the work necessary to implement the specified</u>
> <u>remedies, including continued operation of the Well-D System to contain the</u>
> <u>migration of TCE plumes</u> until the performance standards are achieved.  Cessation
> or impairment of the operation of the Well-D System will require a modification
> of the SOW, and Settling Defendants will be required to implement any work
> required by the modification to achieve or maintain the performance standards or
> to carry out and maintain the effectiveness of the remedy set forth in the ROD.

(Hastings' Reply Br., filing 264, at 9 (emphasis added).)  Hastings also describes a 2004

Administrative Order on Consent, a 1998 Consent Decree entered in <u>United States v. Hastings</u>,

No. 8:98cv265 (D. Neb. August 14, 1998), and a 1992 Administrative Order on Consent that,

according to Hastings, address "the Work . . . connected with the soil, the ground water, the

release or threatened release of hazardous substances, design of the interim remedial action, the

final remedial action and other activities," and provide contribution protection to Hastings under

CERCLA § 113(f)(2).  (<u>See</u> Hastings Br., filing 173, at 8-9, 11, 16.)

     Hastings has demonstrated that it has "resolved its liability to the United States . . . in . . .

administrative or judicially approved settlement[s]," such that it is entitled to contribution

protection under CERCLA § 113(f)(2).  It has also demonstrated that these settlements address

the design and continued operation of the Well D System.  In so doing, however, Hastings has

also demonstrated that its § 107(a) claims must be dismissed.  Like Morrison, Hastings has been

subject to a § 106 and § 107 enforcement action, (<u>see</u> Hastings' Index, filing 172, Ex. E, at CITY

000344 ¶ A), and, as noted above, this action was resolved by a consent decree that obligated

Hastings to ensure the continued operation of the Well D System.  Under these circumstances,

Hastings is "required to use § 113," rather than § 107(a).  <u>Atlantic Research Corp. v. United</u>

<u>States</u>, 459 F.3d 827, 836-37 (8th Cir. 2006).  Also, Hastings has shown that it engaged in a

number of other "administrative settlements" that resolved its potential contribution liability, <u>see</u>

CERCLA § 113(f)(2), and that also address the Well D System (i.e., the 2004 AOC; a 1998

Consent Decree that was entered in <u>United States v. Hastings</u>, No. 8:98cv265 (D. Neb. August

14, 1998); and a 1992 AOC).  Given these facts, I find that Hastings' claims related to the Well

D System cannot proceed under § 107(a), but must instead be brought as contribution claims

under § 113(f).  Dravo's motion for summary judgment on Hastings' § 107(a) claims related to

the Well D system will therefore be granted.

### B.   Non-Contractual Indemnity (Count III)

Dravo argues that Count III of the amended complaint should be dismissed.  (See Dravo's Br., filing 168, at 30-33.)  As noted above, Count III is titled "Non-contractual Indemnity."  (See Am. Compl., filing 53, at 15.)

> Under Nebraska law, indemnification is available when one party is compelled to pay money which in justice another ought to pay, or has agreed to pay, unless the party making the payment is barred by the wrongful nature of his conduct.  Indemnification is distinguishable from the closely related remedy of contribution in that the latter involves a sharing of the loss between parties jointly liable.

Warner v. Reagan Buick, Inc., 483 N.W.2d 764, 771 (Neb. 1992) (citations omitted).  "[I]t is generally recognized that the party seeking indemnification must have been free of any wrongdoing, and its liability vicariously imposed."  Id. (quoting City of Wood River v. Geer-Melkus Construction Co., Inc., 444 N.W.2d 305, 311 (Neb. 1989)).  "If a party seeking indemnification is independently liable to the plaintiff, that party is limited to a claim for contribution."  Id. (citation omitted).

Dravo submits that Morrison's indemnity claim must be dismissed because "Morrison was not without fault, and it has not been held vicariously liable for Dravo's wrongdoing." (Dravo's Br., filing 168, at 32.)  Specifically, Dravo notes that while the amended complaint alleges that "[a]t least 90% of the volume of contaminant[s] captured by the Well-D System . . . is TCE contamination emanating from the Colorado Avenue Subsite," (id. (citing Am. Compl., filing 53, ¶ 74)), the amended complaint also alleges that the Well D System captures CT and EDB, which are "[t]he contaminants at the FAR-MAR-CO Subsite for which Morrison must respond," (Am. Compl., filing 53, ¶¶ 40, 42; see also id. ¶ 78).

In response, Morrison argues,

> The uncontroverted facts in this case establish the exact scenario described by the Warner Court . . . as entitling a party to indemnification.  Morrison has never used, released or otherwise discharged TCE anywhere within the HGWCS. Conversely, Dravo has used, released and otherwise discharged TCE into the environmental [sic] at the 108 Colorado Avenue facility located on the Colorado Avenue Subsite.  TCE contamination emanating from the Colorado Avenue Subsite, for which Dravo is responsible, is being captured and contained by the

18

Well D System.  Morrison is obligated by EPA to operate the Well D System.  In short, Morrison is compelled to pay money to operate the Well D System that is removing TCE contamination from Colorado Avenue, which in justice, Dravo ought to pay.

(Morrison's Response Br., filing 248, at 38-39 (citations omitted).)  It adds that "indemnity enables a party to shift the entire burden of judgment against it to a third party whose actual fault caused injury," and that Morrison is entitled "as a matter of law . . . to indemnification from Dravo" based on the foregoing facts.  (Id. at 39, 42-43.)

As Morrison correctly notes, success on its indemnification claim would shift the entire burden of Morrison's "obligation" to operate Well D from Morrison to Dravo.  (See Morrison's Response Br., filing 248, at 39.  See also Strong v. Nebraska Natural Gas Co., 476 F. Supp. 1170, 1174 (D. Neb. 1979).)  But Morrison has neither alleged nor argued that Dravo bears responsibility for the entirety of this obligation.  Rather, Morrison claims only that Dravo bears responsibility for TCE contamination captured by Well D, (see Morrison's Response Br., filing 248, at 38-39, 42), and Morrison concedes that Morrison is itself responsible for CT and EDB contamination at the FAR-MAR-CO Subsite, (see, e.g., id. at 5).  In short, there is no genuine dispute that Morrison is independently liable for contamination captured by Well D, that Morrison is not free of wrongdoing, and that Morrison's obligation to remedy contamination was not imposed upon it solely as a matter of law.  See Warner v. Reagan Buick, Inc., 483 N.W.2d 764, 771 (Neb. 1992) (citations omitted).  Under these circumstances, Morrison is limited to a claim for contribution, and it cannot succeed on a claim for indemnification for all of its costs associated with Well D.  I find, therefore, that Dravo's motion for summary judgment on Morrison's non-contractual indemnity claim (Count III) should be granted.

Dravo argues that Hastings' indemnity claim should also be dismissed because, "[l]ike Morrison, it is not vicariously liable for contamination emanating from Dravo's facility." (Dravo's Br., filing 168, at 32.)  It adds that Hastings "cannot even claim that it has been compelled . . . to pay damages of any kind," because "[t]he City was not a party to the 1996 Administrative Order on Consent," and "the City voluntarily entered into a cost-sharing agreement with Morrison, basing its decision to do so on the alleged mistake of fact that any TCE captured by Well D would have emanated from the North Landfill."  (Id. (emphasis

19

omitted).)

Dravo's latter argument, i.e., that Hastings was not compelled to pay costs associated with the Well D System, must be rejected.  As I noted above, Hastings was a party to various administrative and judicially approved settlements that establish Hastings' obligation to ensure the continued operation of Well D.  In other words, Hastings' obligation with respect to Well D is not "voluntary."

In response to Dravo's first argument, i.e., that Hastings "is not vicariously liable for contamination emanating from Dravo's facility," Hastings states,

> The City also agreed to incur costs relating to the design, construction and operation of the Well-D System because of its potential CERCLA liability at the North Landfill.  The City never disposed of any TCE at the landfill.  It was merely the operator of the landfill at which Dravo and others disposed of TCE.  Nonetheless, CERCLA imposes constructive, vicarious or derivative liability on former operators of a facility, even though they did not actively dispose of or release any of the hazardous substances.

(Hastings' Response Br., filing 254, at 35.)  As Hastings correctly notes, there is no evidence that Hastings released any TCE at the North Landfill Subsite.  In other words, there appears to be no dispute that Hastings' liability for contamination at the North Landfill Subsite is not based on any wrongdoing on the part of Hastings.  Based on these facts–which differ significantly from those underlying Morrison's indemnification claim–I am not persuaded that Hastings has failed to state a claim for indemnification; nor am I persuaded that Dravo is entitled to judgment on Hastings' indemnification claim as a matter of law.  See Warner v. Reagan Buick, Inc., 483 N.W.2d 764, 771 (Neb. 1992).  Dravo's motion for summary judgment on Hastings' non-contractual indemnity claim (Count III) will be denied.

IT IS ORDERED that "Dravo Corporation's Motion for Partial Summary Judgment on the Morrison Enterprises, LLC and the City of Hastings' Claims Related to the Well D System," filing 154, is granted in part.  Dravo is entitled to summary judgment on Morrison's and Dravo's

20

claims related to the Well D System insofar as they are based on CERCLA § 107(a), and Morrison's indemnification claim (Count III) is dismissed.

Dated November 24, 2009.

BY THE COURT

s/ Warren K. Urbom
United States Senior District Judge